# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| *In re Southwood Financial Data Breach Litigation* | Case No. 1:25-cv-01109 <br><br> DEMAND FOR JURY TRIAL |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Oumou Balde, Blake Wetzel, Dylan Young, Nasir Le Sane, and Devon Rivers ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, alleges the following Consolidated Class Action Complaint (the "Action") against Defendant Southwood Financial LLC ("Southwood" or "Defendant") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

### INTRODUCTION

1.      This class action arises out of the recent targeted ransomware attack and data breach ("Data Breach") on Defendant's network that resulted in unauthorized access to the highly sensitive data. As a result of the Data Breach, Class Members suffered ascertainable losses in the form of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the present risk of imminent harm caused by the compromise of their sensitive personal information.

2.      Defendant is a private student loans administrator and debt collector.

3.      As such, Defendant stores a litany of highly sensitive information about its current and former consumers. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach.

1

4.      Upon information and belief, the specific information compromised in the Data Breach includes, but is not limited to, personally identifiable information ("PII"), such as name, Social Security number, date of birth, address, telephone number, email address and other account information[1].

5.      Upon information and belief, up to and through March 2025, Defendant obtained the PII of Plaintiffs and Class Members and stored that PII, unencrypted, in an Internet-accessible environment on Defendant's network, from which unauthorized actors used an extraction tool to retrieve sensitive PII belonging to Plaintiffs and Class Members.

6.      It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former consumers' PII.

7.      On or around April 30, 2025, the Akira ransomware group took credit for the Data breach and stated that it would upload more than 370 GB of data acquired during breach to the dark web, including, upon information and belief, Plaintiff' and the Class's PII.

8.      Despite Defendant learning of the Data Breach on or about March 25, 202 and the Akira ransomware group taking credit for the Breach on April 30, 2025, Defendant did not begin sending notices of the Data Breach until June 27, 2025

9.      Defendant maintained the PII in a negligent and/or reckless manner. In particular, the PII was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, and

---

[1] Plaintiff Balde's Notice of Data Incident ("Notice") attached hereto as **Exhibit A**.

thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

10.     In addition, upon information and belief, Defendant and its employees failed to properly monitor the computer network, IT systems, and integrated service that housed Plaintiffs' and Class Members' PII.

11.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained is now in the hands of malicious cybercriminals. The risks to Plaintiffs and Class Members will remain for their respective lifetimes.

12.     Defendant further failed to provide timely, accurate and adequate notice to Plaintiffs and Class Members. Plaintiffs and Class Members' knowledge about the PII Defendant lost, as well as precisely what type of information was unencrypted and in the possession of unknown third parties, was unreasonably delayed by Defendant's failure to warn impacted persons immediately upon learning of the Data Breach.

13.     Armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to target other phishing and hacking intrusions using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a present, heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members

must now closely monitor their financial accounts to guard against identity theft for the rest of their lives.

15.     Plaintiffs and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long term credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

17.     Plaintiff Oumou Balde is an individual citizen of Columbus, Ohio, where she intends to remain. Plaintiff is a Data Breach victim, having received a notice letter from Southwood.

18.     Plaintiff Blake Wetzel is an individual citizen of Excelsior Springs, Missouri, where he intends to remain. Plaintiff is a Data Breach victim, having received a notice letter from Southwood.

19.     Plaintiff Dylan Young is an individual citizen of Tampa, Florida, where he intends to remain. Plaintiff is a Data Breach victim, having received a notice letter from Southwood.

20.     Plaintiff Nasir Le Sane is an individual citizen of Hackensack, New Jersey, where he intends to remain. Plaintiff is a Data Breach victim, having received a notice letter from Southwood.

21.     Plaintiff Devon Rivers is an individual citizen of Brooklyn, New York, where he intends to remain. Plaintiff is a Data Breach victim, having received a notice letter from Southwood.

22.     Defendant Southwood Financial LLC is a financial institution with its principal place of business located in Sterling, Virginia.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24.     This Court has personal jurisdiction over Defendant Southwood Financial LLC, because its principal place of business is in Virginia, and it does a significant amount of business in Virginia.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant Southwood Financial LLC has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND FACTS

**A.     Defendant's Businesses**

26.     According to Defendant's website, it is "a private student loan administrator, [that] specialize[s] in managing distressed student loan receivables with industry leaders, shepherding borrowers to financial stability."[2]

---

[2] https://swfin.com/about-us/ (last accessed July 7, 2025)

27.    On information and belief, Defendant maintains the PII of current and former consumers, including but not limited to name, Social Security number, date of birth, address, telephone number, and email address.

28.    Plaintiffs and Class Members directly or indirectly entrusted Defendant with sensitive and confidential PII, which includes information that is static, does not change, and can be used to commit myriad financial crimes.

29.    Because of the highly sensitive and personal nature of the information Defendant acquires, stores, and has access to, Defendant, upon information and belief, promised to, among other things: keep PII private; comply with industry standards related to data security and PII; inform individuals of their legal duties and comply with all federal and state laws protecting PII; and provide adequate notice to impacted individuals if their PII is disclosed without authorization, including through its privacy policy disclosures.[3]

30.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

31.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

32.    Plaintiffs and the Class Members relied on Defendant to implement and follow adequate data security policies and protocols, to keep their PII confidential and securely maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of the PII.

---

[3] *See* https://swfin.com/privacy-policy/ ("Southwood Financial is committed to protecting your privacy.") (last accessed July 7, 2025).

**B.**      **Defendant Fails to Safeguard Consumer PII**

33.      On or around June 27, 2025, Defendant informed Plaintiffs and the Class

Members of the Data Breach via a letter ("Notice"):

> **What Happened.** On March 25, 2025, we discovered suspicious activity that
> temporarily disrupted the operability of our computer network. Upon learning of
> this activity, we took immediate steps to secure our environment and engaged
> digital forensics specialists to assist with the investigation. Through the
> investigation, we discovered that certain files may have been accessed or acquired
> without authorization. We reviewed those files and determined on May 29, 2025
> that some of your personal information was within the potentially affected data
> which is the reason for this notification.

> **What Information Was Involved.** The information may have included your name,
> Social Security number, date of birth, address, telephone number, email address
> and other account information. Please note that we have no evidence of the misuse,
> or attempted misuse, of any potentially impacted information.[4]

34.      It is likely the Data Breach was targeted at Defendant due to its status as a financial

services provider that collects, creates, and maintains sensitive PII.

35.      Currently, the precise number of persons injured is unclear. But upon information

and belief, the size of the putative class can be ascertained from information in Defendant's

custody and control. And upon information and belief, the putative class is over one hundred

members—as it includes its current and former consumers.

36.      Upon information and belief, the cyberattack was expressly designed to gain access

to private and confidential data of specific individuals, including (among other things) the PII of

Plaintiffs and the Class Members.

37.      Upon information and belief, and based on Defendant's Notice, Plaintiffs PII was

stolen in the Data Breach. Plaintiffs further believe that their PII was likely subsequently sold on

the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals.

---

[4] Exhibit A.

38.     And yet, Defendant waited over until June 27, 2025, before it began notifying the class—a full 94 days after the Data Breach was discovered.[5]

39.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner. Furthermore, Defendant's delay in notifying Plaintiffs and Class members of the Data Breach is in direct violation of Defendant's responsibilities under the data breach notification statute in Virginia. ***See*** Va. Code Ann. § 18.2-186.6(B) which requires that the disclosure notification be made "without unreasonable delay."[6]

40.     There are also numerous issues with Defendant's Data Breach notification letter, which further exacerbates the circumstances for victims of the Data Breach: (1)  Southwood waited over ***three*** months to notice Plaintiffs and Class members of the Data Breach; (2) Southwood fails to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the PII that Southwood continues to maintain is secure; and (3)  Southwood fails to state how the breach itself occurred.

41.     And when Defendant did finally notify Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

> a.    "[W]e recommend that you remain vigilant by reviewing your account statements and credit reports closely."[7]

---

[5] *Id.*

[6] While the definition of "reasonable" differs from state to state, it ranges from 30-60 days. Defendant failed to meet this requirement by over 30 days.

[7] *Id.*

b. "If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained."[8]

c. "You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission."[9]

42. Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

43. Defendant had obligations created by contract, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their PII confidential and to protect them from unauthorized access and disclosure.

44. Plaintiffs and the Class Members reasonably relied (directly or indirectly) on Defendant's sophistication and representations to keep their sensitive PII confidential; to maintain proper system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

45. Plaintiffs' and Class Members' unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions, and due to the utter failure to protect Class Members' PII. Criminal hackers obtained their PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The risks to Plaintiffs and Class Members will remain for their respective lifetimes.

---

[8] *Id.*
[9] *Id.*

46.     Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendant inflicted upon them.

**C.      Akira & the Dark Web**

47.     Worryingly, the cybercriminals that obtained Plaintiffs' and Class Members' PII appear to be the notorious cybercriminal group "Akira."[10]

48.     Akira is an especially notorious cybercriminal group. In fact, the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about Akira.[11] Specifically, the joint "Cybersecurity Advisory" (CSA) stated, *inter alia*, that:

> a.   "Since March 2023, Akira ransomware has impacted a wide range of businesses and critical infrastructure entities in North America, Europe, and Australia."[12]
>
> b.   "The FBI and cybersecurity researchers have observed Akira threat actors obtaining initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA)[.]"[13]
>
> c.   "Akira threat actors use a double-extortion model [T1657] and encrypt systems [T1486] after exfiltrating data."[14]

---

[10] *Akira*, RANSOM LOOK, https://www.ransomlook.io/group/akira (last visited Aug. 25, 2025).
[11] *#StopRansomware: Akira Ransomware*, FBI & CISA (April 18, 2024) https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a.
[12] *Id*.
[13] *Id*.
[14] *Id*.

d.  "The Akira ransom note provides each company with a unique code and instructions to contact the threat actors via a .onion URL."[15]

e.  "Ransom payments are paid in Bitcoin to cryptocurrency wallet addresses provided by the threat actors."[16]

f.  "To further apply pressure, Akira threat actors threaten to publish exfiltrated data on the Tor network, and in some instances have called victimized companies, according to FBI reporting."[17]

49.    On or around May 8, 2025, Akira revealed its involvement in the Data Breach and explained on the Dark Web that:

a.  "Southwood Financial specializes in private student loan solutionsand [*sic*] debt settlement services aimed at helping borrowers achieve financial stability."[18]

b.  "SWF FUNDING LLC and EduCap Inc. have also been impacted and lost their data."[19]

c.  "We are going to to [*sic*] upload more than 370 GB of data of these companies."[20]

d.  "In the archives you will find the following: personal information of employees and borrowers (SSNs, passports and so on), financial data

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Akira*, RANSOM LOOK, https://www.ransomlook.io/group/akira (last visited Aug. 25, 2025).

[19] *Id.*

[20] *Id.*

(audits, payment details, reports), a lot of corporate NDAs, confidentiality agreements, etc."[21]

50.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[22]

51.     Still, despite this public evidence of broad misuse, Defendant misleadingly claims that "Please note that we have no evidence of the misuse, or attempted misuse, of any potentially impacted information."[23]

52.     Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already been published—or will be published imminently—by Akira on the Dark Web.

**D.     The Value of Personal Identifiable Information**

53.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[24]

54.     Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[25]

---

[21] *Id.*

[22] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back. (last visited Aug. 25, 2025)

[23] *Data Breach Notification*, CAL ATTY GEN (last visited Aug. 25, 2025) https://oag.ca.gov/system/files/Southwood-ConsumerLetter.pdf.

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Aug. 25, 2025).

[25] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/(last visited Aug. 25, 2025).

55.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

56.     Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

57.     Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

58.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card

---

[26] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 25, 2025).

[27]     Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 25, 2025).

information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[28]

59.      PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[29]

60.      Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

61.      The PII compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

62.      Moreover, as mentioned above, Southwood has offered only a limited one-year subscription for identity theft monitoring and identity theft protection through Cyberscout. Its limitation is inadequate when victims are likely to face many years of identity theft.

63.      Furthermore, Defendant's credit monitoring offer and advice to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words, Defendant expects Plaintiffs and Class Members to protect themselves from its tortious acts

---

[28]  Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 25, 2025).
[29] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1 (last visited Aug. 25, 2025).

resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

64.     These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

65.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Southwood's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

**E.     The Data Breach was a Foreseeable Risk and Defendant was on Notice**

66.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

67.     In light of recent high profile data breaches at other financial services companies, Defendant knew or should have known that their electronic records and PII they maintained would be targeted by cybercriminals and ransomware attack groups.

68.     Defendant knew or should have known that these attacks were common and foreseeable.

69.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[30] The 330 reported

---

[30]    *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6. (last visited Aug. 25, 2025).

breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[31]

70.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "*[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies*.  They breach networks, use specialized tools to maximize damage, *leak corporate information on dark web portals*, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[32]

71.    In Feburary 2021, the United States Cybersecurity and Infrastructure Security Agency advised that "*[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data* if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[33]

72.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF),

---

[31] *Id.*

[32] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), *available at* https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Aug. 25, 2025).

[33] U.S. CISA, CISA Launches Campaign to Reduce the Risk of Ransomware, *available at* https://www.cisa.gov/news-events/news/cisa-launches-campaign-reduce-risk-ransomware    (last visited Aug. 25, 2025).

Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[34]

---

[34] *Id.* at 3-4.

73.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[35]

---

[35] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Aug. 25, 2025).

74.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and website's application flow. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    failing to adequately protect PII;

c.    failing to properly monitor their own data security systems for existing intrusions;

d.    failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

e.    failing to ensure the confidentiality and integrity of electronic PII it created, received, maintained, and/or transmitted;

f.    failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

g.    failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.    failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.    failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII;

      j.        failing to train all members of their workforces effectively on the policies and procedures regarding PII;

      k.        failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals;

      l.        failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

      m.        failing to adhere to industry standards for cybersecurity as discussed above; and,

      n.        otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' PII.

75.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

## F.    Defendant Fails to Comply with FTC Guidelines

76.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

77.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security

problems.[36] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[37]

78.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

79.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.    These FTC enforcement actions include actions against financial institutions like Defendant.

81.    Defendant failed to properly implement basic data security practices.

---

[36] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 25, 2025).
[37] *Id.*

82.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers and other impacted individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

83.     Defendant was at all times fully aware of its obligation to protect the PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## G.     Consumers Prioritize Data Security

84.     In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[38] Therein, Cisco reported the following:

   a.   "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[39]

   b.   "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[40]

   c.   89% of consumers stated that "I care about data privacy."[41]

   d.   83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[42]

---

[38]    *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Aug. 25, 2025).

[39] *Id*. at 3.

[40] *Id*.

[41] *Id*. at 9.

[42] *Id*.

    e.   51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[43]

    f.   75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[44]

## H.    Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft

85.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

    a.   loss of the opportunity to control how their PII is used;

    b.   diminution in value of their PII;

    c.   compromise and continuing publication of their PII;

    d.   out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.   lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.   delay in receipt of tax refund monies;

    g.   unauthorized use of their stolen PII; and

---

[43] *Id*.

[44] *Id*. at 11.

h.  continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

86.  Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

87.  The value of Plaintiffs and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

88.  It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

89.  One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

90.  The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

91.  In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this

Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

## I.     Defendant Fails to Comply with Industry Standards

92.     As shown above, experts studying cyber security routinely identify financial institutions as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

93.     Several best practices have been identified that at a minimum should be implemented by financial institutions like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

94.     Other best cybersecurity practices that are standard in the financial industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

95.     Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

96.     These foregoing frameworks are existing and applicable industry standards in the financial industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

**J.      Plaintiffs' and Class Members' Damages**

***Plaintiff Balde's Experience***

97.     Plaintiff Balde provided her information to Defendant as a condition of becoming a consumers of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

98.     Plaintiff is very careful about sharing her sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

99.     Plaintiff stores any documents containing her sensitive PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

100.    Plaintiff provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

101.    Plaintiff first learned of the Data Breach after receiving a Notice of Data Breach letter from Defendant dated June 27, 2025.

102.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

103.    Based on the information she provided to Defendant, Plaintiff has reason to believe that her PII including, but not limited to, her name, Social Security number, date of birth, address,

telephone number, email address and other account information were compromised in this Data Breach.

104.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

105.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of her life, that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

106.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

107.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

108.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of her life.

***Plaintiff Wetzel's Experience***

109.    Plaintiff Wetzel provided his information to Defendant as a condition of becoming a consumers of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

110.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

111.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

112.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

113.    Plaintiff first learned of the Data Breach after receiving a Notice of Data Breach letter from Defendant dated June 27, 2025.

114.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

115.    Based on the information he provided to Defendant, Plaintiff has reason to believe that his PII including, but not limited to, his name, Social Security number, date of birth, address, telephone number, email address and other account information were compromised in this Data Breach.

116.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

117.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of his life, that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

118.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

119.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

120.    Indeed, following the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and/or phone calls.

121.    Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[45] On information and belief, the spam calls and texts Plaintiff is experiencing is a result of the Data Breach.

122.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In

---

[45] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited Aug. 25, 2025).

addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

***Plaintiff Young's Experience***

123.    Plaintiff provided his information to Defendant as a condition of becoming a consumer of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

124.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

125.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

126.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

127.    Plaintiff first learned of the Data Breach after receiving a Notice of Data Breach letter from Defendant dated June 27, 2025.

128.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

129.    Based on the information he provided to Defendant, Plaintiff has reason to believe that his PII including, but not limited to, his name, Social Security number, and date of birth, were compromised in this Data Breach.

130.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach, including but not limited to

researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

131.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of his life, that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

132.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

133.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

134.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

***Plaintiff Le Sane's Experience***

135.    Plaintiff provided his information to Defendant as a condition of becoming a consumers of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

136.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

137.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

138.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

139.    Plaintiff first learned of the Data Breach after receiving a Notice of Data Breach letter from Defendant dated June 27, 2025.

140.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

141.    Based on the information he provided to Defendant, Plaintiff has reason to believe that his PII including, but not limited to, his name, Social Security number, date of birth, address, telephone number, email address and other account information were compromised in this Data Breach.

142.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

143.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of his life, that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

144.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

145.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

146.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

***Plaintiff Rivers' Experience***

147.    Plaintiff provided his information to Defendant as a condition of becoming a consumers of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

148.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

149.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

150.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and

federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

151. Plaintiff first learned of the Data Breach after receiving a Notice of Data Breach letter from Defendant dated June 27, 2025.

152. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

153. Based on the information he provided to Defendant, Plaintiff has reason to believe that his PII including, but not limited to his name, Social Security number, date of birth, address, telephone number, email address, and other account information were compromised in this Data Breach.

154. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

155. Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of his life, that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

156. Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

157.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

158.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

160.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All persons identified by Defendant (or its agents or affiliates) as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class").**

161.    Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

162.    Plaintiffs reserve the right to amend or modify the Class definitions as this case progresses.

163.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief, thousands of individuals had their PII compromised

35

in this data breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

164.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    if Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    if Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    if Defendant owed a duty to Class Members to safeguard their PII;

f.    if Defendant breached their duty to Class Members to safeguard their PII;

g.    if Defendant knew or should have known that their data security systems and monitoring processes were deficient;

h.    if Defendant should have discovered the Data Breach sooner;

i.    if Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    if Defendant's conduct was negligent;

k.    if Defendant's breach implied contracts with Plaintiffs and Class Members;

l.     if Defendant were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m.    if Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.     if Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

165.   Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

166.   Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

167.   Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

168.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

169.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

170.    Likewise, particular issues under Rule 23(c)(4)(a) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    if Defendant failed to timely notify the public of the Data Breach;

    b.    if Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.    if Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.    if Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.    if Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

f.    if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

171.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

172.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

173.    Plaintiffs and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

174.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

175.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

176.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

177.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

    a.  exercise reasonable care in handling and using the PII in its care and custody;

    b.  implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c.  promptly detect attempts at unauthorized access;

    d.  notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

178.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

179.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

180.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

181.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship

arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

182.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

183.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

184.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

185.    Defendant breached these duties as evidenced by the Data Breach.

186.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

      a.  disclosing and providing access to this information to third parties and

      b.  failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

187.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

188.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

189.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

190.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

191.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

192.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On behalf of the Plaintiffs and the Class)

193.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

194.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PII.

195.    Defendant breached its duties to Plaintiffs and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PII.

196.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

197.    The injuries to Plaintiffs and Class members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

198.    Plaintiffs and Class members were within the class of persons the Federal Trade Commission Act intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

199.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class members, Plaintiffs and Class members would not have been injured.

200.    The injuries and harms suffered by Plaintiffs and Class members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiffs and Class members to experience the foreseeable harms associated with the exposure of their PII.

201.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On behalf of the Plaintiffs and the Class)**

202.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

203.    Plaintiffs and the Class entrusted their PII to Defendant as a condition of receiving Defendant's services. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

204.    At the time Defendant acquired the PII of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII, including as reflected in its privacy policy disclosures.

205.    Implicit in the agreements between Plaintiffs and Class Members and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

206.    Plaintiffs and the Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII internet-accessible, not encrypt sensitive data elements, and not delete the PII that Defendant no longer had a reasonable need to maintain it.

207.    Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

208.    Defendant breached the implied contracts they made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

209.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

210.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## FOURTH CAUSE OF ACTION
### Invasion of Privacy
### (On behalf of the Plaintiffs and the Class)

211.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

212.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

45

213.    Defendant owed a duty to Plaintiffs and Class Member to keep their PII confidential.

214.    The unauthorized disclosure and/or acquisition (*i.e.,* theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

215.    Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' PII constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

216.    Defendant's failure to protect Plaintiffs' and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

217.    Defendant knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

218.    Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

219.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

220.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

221.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

222.    Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

223.    Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### FIFTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

224.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

225.    In providing their PII, directly or indirectly, to Defendant, Plaintiffs and Class members justifiably placed a special confidence in Defendant to act in good faith and with due regard to interests of Plaintiffs and class members to safeguard and keep confidential that PII.

226.    Defendant accepted the special confidence Plaintiffs and Class members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiffs' and Class Members' personal information as detailed in its Privacy Policy.

227.    In light of the special relationship between Defendant and Plaintiffs and Class members, whereby Defendant became a guardian of Plaintiffs' and Class members' PII, Defendant

became a fiduciary by its undertaking and guardianship of the PII, to act primarily for the benefit of its consumers, including Plaintiffs and Class members, for the safeguarding of Plaintiffs' and Class members' PII.

228.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of its relationship with Defendants' consumers, in particular, to keep secure the PII of its consumers.

229.    Defendant breached its fiduciary duties to Plaintiffs and Class members by failing to protect the integrity of the systems containing Plaintiffs' and Class members' PII.

230.    Defendant breached its fiduciary duties to Plaintiffs and class members by otherwise failing to safeguard Plaintiffs' and Class members' PII.

231.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

232.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

233.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and
incorporate them by reference herein.

234.    This claim is pleaded in the alternative to the breach of implied contract claim.

235.    Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon
Defendant. After all, Defendant benefitted from (1) using their PII to provide services, and (2)
accepting payment.

236.    Defendant appreciated or had knowledge of the benefits it received from Plaintiffs
and Class Members.

237.    Plaintiffs and Class Members (or their third-party agents) reasonably understood
that Defendant would use adequate cybersecurity measures to protect the PII that they were
required to provide based on Defendant's duties under state and federal law and its internal
policies.

238.    Defendant enriched itself by saving the costs they reasonably should have expended
on data security measures to secure Plaintiffs' and Class Members' PII.

239.    Instead of providing a reasonable level of security, or retention policies, that would
have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations
at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures.
Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of
Defendant's failure to provide the requisite security.

240.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) payment because Defendant failed to adequately protect their PII.

241.    Plaintiffs and Class Members have no adequate remedy at law.

242.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SEVENTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs and the Class)**

243.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

244.    At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII that Plaintiffs and Class Members entrusted to Defendant.

245.    As alleged herein and above, Defendant's relationship with Plaintiffs and the Class was governed by terms and expectations that Plaintiffs' and the Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

246.    Plaintiffs and the Class entrusted Defendant with their PII with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

247.    Plaintiffs and the Class also entrusted Defendant with their PII with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

248.    Defendant voluntarily received Plaintiffs' and Class Members' PII in confidence with the understanding that their PII would not be disclosed or disseminated to the public or any unauthorized third parties.

249.    As a result of Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

250.    As a direct and proximate cause of Defendant's actions and omissions, Plaintiffs and the Class have suffered damages.

251.    But for Defendant's disclosure of Plaintiffs' and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII as well as the resulting damages.

252.    The injury and harm Plaintiffs and the Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendant knew or should have known its methods of accepting and securing Plaintiffs' and Class Members' PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and Class Members' PII.

253.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Class, Plaintiffs and the Class have suffered and will suffer injury, including but

not limited to: (i) identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of individuals; and (viii) present and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

254.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## EIGTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class)

255.    Plaintiffs repeat and re-allege paragraphs 1 through 171 of this Complaint and incorporate them by reference herein.

256.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

257.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

258.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.  Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b.  Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    c.  Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    d.  Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

259.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

260.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

261.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—

while warranted for out-of-pocket damage and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class Members' injuries.

262.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

263.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order;

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.      requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.      requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

v.      requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi.      prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vii.      requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.      requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.      requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.      requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvii.      requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment and post-judgement interest on all amounts awarded;

G.      Granting Plaintiffs and the Class leave to amend this Complaint to conform to the evidence produced at trial; and

H.      Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: August 29, 2025          Respectfully Submitted

By:    */s/ Lee A. Floyd*
Lee A. Floyd (VSB No. 88459)
Justin M. Sheldon (VSB No. 82632)
**BREIT BINIAZAN, PC**
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Telephone: (804) 351-9040
Facsimile: (804) 351-9170
Lee@bbtrial.com
Justin@bbtrial.com

Raina C. Borrelli (*pro hac vice*)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Leanna A. Loginov (*pro hac vice* forthcoming)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
Email: lloginov@shamisgentile.com

Ryan D. Maxey*
**MAXEY LAW FIRM, P.A.**
107 N. 11th St. #402
Tampa, Florida 33602
Telephone: (813) 448-1125
Email: ryan@maxeyfirm.com

David K. Lietz
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
Phone: 866.252.0878
dlietz@milberg.com

*Interim Co-Lead Counsel*

William "Billy" Peerce Howard, Esq.
**THE CONSUMER PROTECTION FIRM,
PLLC**
401 East Jackson Street, Suite 2340
Truist Place
Tampa, FL 33602
Telephone: (813) 500-1500
Billy@TheConsumerProtectionFirm.com

David Hilton Wise, VSB # 30828
Dylan S. Graham, VSB # 100051
Robert D. Witte, VSB # 97294
**WISE LAW FIRM, PLC**
10640 Page Street, Ste 320
Fairfax, Virginia 22030
Tel: (703) 934-6377
Fax: (703) 934-6379
dwise@wiselaw.pro
dgraham@wiselaw.pro
rwitte@wiselaw.pro

Gary E. Mason*
Danielle L. Perry*
Ra O. Amen*
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com
Email: ramen@masonllp.com

Steven T. Webster (VSB No. 31975)
WEBSTER BOOK LLP
300 N. Washington St., Suite 404
Alexandria, Virginia 22314
Telephone: (888) 987-9991
swebster@websterbook.com

Patrick A. Barthle*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
Florida Bar No. 99286
pbarthle@ForThePeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 229-4023
Facsimile: (813) 222-4708

*pro hac vice* application forthcoming

***Attorneys for Plaintiffs and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I, Lee A. Floyd, hereby certify that on August 29, 2025, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to counsel of record, below, via the ECF system.

DATED this 29th day of August, 2025.

<div style="margin-left:3em">

BREIT BINIAZAN, PC

By:  */s/ Lee A. Floyd*_____
    Lee A. Floyd (VSB No. 88459)
    BREIT BINIAZAN, PC
    2100 East Cary Street, Suite 310
    Richmond, Virginia 23223
    Telephone: (804) 351-9040
    Facsimile: (804) 351-9170
    Lee@bbtrial.com

</div>